# In the United States Court of Federal Claims

No. 21-1966C

(**Filed Under Seal**: January 18, 2022)

(**Filed**: February 4, 2022)

|  |  |
|---|---|
| GOLDEN IT, LLC, | ) |
| *Plaintiff,* | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| *Defendant,* | ) |
| and | ) |
| SPATIAL FRONT, INC., | ) |
| *Defendant-Intervenor.* | ) |

*Jon D. Levin*, Maynard, Cooper & Gale, P.C., Hunstville, AL, for Plaintiff.  With him on the briefs were *W. Brad English*, *J. Dale Gibson*, *Emily L. Chancey*, *Joshua B. Duvall*, and *Nicholas P. Greer*.

*Bret R. Vallacher*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was *Wilmary Bernal*, Contract Law Division, Office of General Counsel, United States Department of Commerce, Washington, D.C.

*Katherine Burrows*, PilieroMazza PLLC, Washington, D.C., for Defendant-Intervenor.  Of counsel were *Jonathan T. Williams*, *Samuel F. Finnerty*, and *Patrick T. Rothwell*.

## OPINION AND ORDER[*]

*SOLOMSON*, **Judge.**

The first population count of the United States began in 1790 under President George Washington.[1]  The 1790 count was, by today's standards, a rudimentary affair — a mere "single schedule calling for only two or three details as to the color, sex, and age of the population."[2]

In contrast, the modern census is "a massive undertaking," complete with resources available in 59 languages and including "brochures, posters, factsheets, and social media toolkits."[3]  The 2020 census cost the federal government upwards of $14 billion to complete.[4]  The data produced by today's United States Census Bureau comprises "the primary source of statistics" regarding our nation's economy and population.[5]  *See* ECF No. 44, Corrected Administrative Record ("AR") 1215.  Over time, the Census Bureau "has become increasingly reliant upon information technology" to maintain and improve the quality of its data.  *Id.*  As part of that effort, the Census Bureau's Geography Division maintains the Master Address File/Topologically Integrated Geographic Encoding and Referencing System ("MAF/TIGER System"), which is comprised of various software applications and databases that integrate spatial and address data from "more than 40,000 tribal, state, and local governments." AR 1215–16.

In this post-award bid protest, Plaintiff, Golden IT, LLC ("Golden") challenges the decision of Defendant, the United States, acting by and through the Department of

---

[*] On January 18, 2022, the Court filed, under seal, this opinion and order and provided the parties the opportunity to propose redactions.  On February 3, 2022, the parties filed proposed redactions, ECF Nos. 56, 57, which this Court adopts, in part, and accordingly reissues this public version of this opinion and order.

[1] *1790 Overview*, United States Census Bureau, https://www.census.gov/history/www/through_the_decades/overview/1790.html (last visited Jan. 7, 2021).

[2] Carroll D. Wright, *The History and Growth of the United States Census*, S. Doc. No. 56-194, at 8 (1st Sess. 1900); *see also id.* at 13 (noting, of the 1790 population count, that "in the modern sense of the term it can not truthfully be called a census").

[3] *2020 Decennial Census Program Management*, United States Census Bureau, https://www.census.gov/programs-surveys/decennial-census/decade/2020/planning-management.html (last visited Jan. 7, 2021).

[4] U.S. Gov't Accountability Off., GAO-21-478, 2020 Census: Innovations Helped with Implementation, but Bureau Can Do More to Realize Future Benefits 6 (2021).

[5] In addition to the decennial census, the Census Bureau "also conducts a census of all business establishments and of all governmental units . . . every five years."  AR 1215.

Commerce and the Geography Division of the United States Census Bureau ("Census" or the "Agency"), to award a single-award Blanket Purchase Agreement ("BPA") with five one-year options to Defendant-Intervenor, Spatial Front, Inc. ("SFI") for general IT support for the MAF/TIGER System and related programs. Golden objects to the award to SFI as arbitrary, capricious, and otherwise contrary to law. The parties filed cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").

For the reasons explained below, the Court **GRANTS** the pending motions to supplement the administrative record. The Court further **GRANTS** the government's and Defendant-Intervenor's respective motions for judgment on the administrative record. The Court **DENIES** Golden's motion for judgment on the administrative record.

## I.   PROCEDURAL BACKGROUND

Seeking a full range of IT support for the MAF/TIGER System and associated programs, Census initiated a two-phase procurement on April 14, 2021. AR 1304. Phase I entailed selecting the "Best Qualified Vendors" from the responses submitted to a series of preliminary questions. AR 661 (Technical Evaluation Team Phase I Report), AR 1304. On April 19, 2021, Census received responses from four vendors — Golden; SFI; [ * * * ]; and [ * * * ]. AR 661. Census's Technical Evaluation Team recommended all four vendors to proceed to Phase II of the procurement. AR 665.

In Phase II, which began on April 22, 2021, Census invited the vendors to submit responses to Request for Quote ("RFQ") No. 1333LB21Q00000003 (the "Solicitation") to award a BPA with a one-year base period and five one-year options. AR 1204, 1258, 1304. Though the government planned to issue most call orders to the eventual awardee after award, "with more specifically described needs as they arise," AR 1212, the Solicitation provided that Census would award both the BPA and first call order simultaneously. AR 1303, 1310. Census estimated the total value of the BPA to be $98 million and designated the Solicitation as a set-aside for Women-Owned Small Businesses and/or Service-Disabled Veteran-Owned Small Businesses pursuant to FAR 8.405-3 under the General Services Administration's ("GSA") Multiple Award Schedule ("MAS") program. AR 1211, 1213.[6]

---

[6] *See* FAR 8.401 ("Ordering activity means an activity that is authorized to place orders, or establish blanket purchase agreements (BPA), against the General Services Administration's (GSA) Multiple Award Schedule contracts."); FAR 8.402(f) (specifying how, "[f]or administrative convenience, an ordering activity contracting officer may add items not on the Federal Supply Schedule (also referred to as open market items) to a Federal Supply Schedule [BPA] or an individual task or delivery order"); FAR 8.405-3 ("Blanket purchase agreements"); FAR 8.405-5 (providing ordering activity with discretion to set aside BPAs and orders).

The RFQ required that quotes include two parts, which were to be submitted simultaneously:  "Technical" (referred to as either "Part 1" or "Volume 1") and "Price" (referred to as either "Part 2" or "Volume 2").  AR 1311.[7]  The Technical Part was comprised of three evaluation factors: "Management Approach for Master BPA" ("Factor 1"); "Similar Experience and Past Performance" ("Factor 2"); and "Call Order 0001 — Technical" ("Factor 3").  AR 1311.  Factor 2, in turn, had two subfactors: "Similar Experience" ("Subfactor 2A") and "Past Performance" ("Subfactor 2B").  *Id.*  Factor 3 also had two subfactors: "Technical Approach for Call Order 0001" ("Subfactor 3A") and "Call Order 0001 Key Personnel" ("Subfactor 3B").  *Id.*  Following a series of RFQ amendments, Census issued a revised, conformed Solicitation on May 14, 2021.  AR 2858–59.  Quotes were due on May 20, 2021.  AR 2757–58.

Census received timely quotes from all four vendors invited to participate in Phase II.  AR 2859; *see also* AR 1446–72 (Golden); AR 1473–1652 ([ * * * ]); AR 1653–1818 (SFI); AR 1819–2022 ([ * * * ]).  Census awarded the BPA, along with the first call order, to SFI on September 22, 2021.  AR 2881–82.

On October 5, 2021, Golden filed its initial complaint, ECF No. 1, and a motion for preliminary injunction ("PI Motion"), ECF No. 6, against the United States in this Court.  The next day, SFI filed a motion to intervene, ECF No. 14, which this Court granted, Minute Order (Oct. 6, 2021).  The Court held a telephonic preliminary status conference on October 6, 2021, to discuss, among other things, Golden's PI Motion.  ECF No. 13; Minute Order (Oct. 6, 2021).  During the status conference, the parties represented that the government agreed to stay performance of the BPA award (and the first call order) through December 16, 2021.  *See* ECF No. 16 (October 7, 2021, joint status report).  Accordingly, the Court noted in its Order dated October 7, 2021 that "[t]he Court understands that the voluntary stay agreement will be without prejudice to Plaintiff should Plaintiff succeed on the merits of its protest and seek permanent injunctive relief" and that "[i]f the Court correctly understands the voluntary stay agreement, Plaintiff shall either withdraw its motion for a preliminary injunction or inform the Court that the motion should be denied as moot."  ECF No. 17 at 2.  On October 13, 2021, Golden filed a notice requesting that the Court enter an order denying as moot Golden's PI Motion.  ECF No. 30.  Accordingly, the Court denied Golden's PI Motion.  Minute Order (Oct. 13, 2021).[8]

---

[7] *See also* AR 1310 (instructing that the "quote shall be submitted in Two (2) Parts, Part 1 – Technical and Part 2 – Price").

[8] At the conclusion of oral argument on the motions for judgment on the administrative record, the government represented that it would extend its stay of performance of the BPA and first call order to January 14, 2022.  ECF No. 52, Oral Argument Transcript ("Tr.") at 131:18–132:11.

The government filed the administrative record on October 15, 2021.  ECF No. 32.[9]  On October 20, 2021, Golden filed an amended complaint.  ECF No. 33 ("Am. Compl.").  In its amended complaint, Golden alleged:  (1) SFI's quote failed to meet a material term of the Solicitation by failing to provide the required years of experience for four of the Solicitation's 26 Labor Categories ("LCATs") and, thus, was unawardable, Am. Compl. ¶¶ 61–68 (Count One); (2) Census's "evaluation of Factors 1 and 2 was unreasonable, arbitrary, capricious, and otherwise contrary to law" and a proper evaluation of those factors "would have placed Golden IT ahead of Spatial Front," *id.* ¶¶ 69–82 (Count Two); (3) Census's evaluation of Factor 3 was "unreasonable, arbitrary, capricious, and otherwise contrary to law" because, among other reasons, SFI improperly "proposed Mr. [JH] as a key person" because "Mr. [JH] took a position with [another company] before Spatial Front submitted its quote and four months before Spatial Front received an award," *id.* ¶¶ 83–92 (Count Three); and (4) Census's best value analysis was arbitrary and capricious, *id.* ¶¶ 93–95 (Count Four).

Golden filed its motion for judgment on the administrative record on October 29, 2021.  ECF No. 37 ("Pl. MJAR").  The government and SFI filed cross-motions for judgment on the administrative record on November 12, 2021.  *See* ECF Nos. 42 ("Def. MJAR"), 43 (SFI's MJAR).  The parties filed timely reply briefs.  *See* ECF Nos. 46 ("Pl. Reply"), 48 ("Def. Reply"), 49 (SFI's Reply).

All three parties moved to supplement the administrative record prior to oral argument.  On October 26, 2021, Golden moved to supplement the record with a purported "copy of the LinkedIn profile of Spatial Front's proposed key personnel, [JH]."  ECF No. 34 at 1.  The Court stayed the briefing schedule on that motion, ordering the parties to "be prepared to address this motion during the eventual oral argument."  ECF No. 35 at 1.  While the Court allowed the parties to "cite the document Golden IT seeks to have added to the administrative record" in their briefs, the Court cautioned that such permission "constitutes no guarantee of whether, or for what purpose, the Court ultimately may consider the documents in question."  *Id.* at 1–2.

SFI filed its motion to supplement the record on November 12, 2021.  ECF No. 40.  SFI sought to include (1) "a Declaration of [JD], [SFI's] Vice President, Human Resources and Contracts"; and (2) "a letter of commitment from Mr. [JH] . . . stating that he remains committed and available to serve as the Information Specialist–Knowledge Engineer position under the RFQ, as proposed by SFI."  *Id.* at 3.  No party filed, attempted to file, or sought leave to file responses in opposition to that motion.

---

[9] On October 8, 2021, SFI filed a motion to dismiss Golden's complaint pursuant to RCFC 12(b)(6).  ECF No. 18.  The Court denied the motion, without prejudice, on October 13, 2021, because, among other reasons, SFI had "agreed to a briefing schedule with the other parties, pursuant to which the government will file the administrative record later this week" and "that schedule already provides time for Golden IT to file an amended complaint."  ECF No. 31 at 1.

Finally, on November 12, 2021, the government filed an unopposed motion to correct the administrative record. ECF No. 41. The government noted that "Census's Contract Specialist inadvertently failed to send to us two one-page documents when compiling the administrative record," and thus the government filed its motion "to include the accompanying documents." *Id.* at 1. The Court granted the unopposed motion, Minute Order (Nov. 15, 2021), and the government corrected the administrative record on November 15, 2021, ECF No. 44.

The Court held oral argument on the parties' various motions on December 14, 2021. ECF Nos. 50, 52 ("Tr.").

## II.   JURISDICTION AND STANDARD OF REVIEW

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, provides this Court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).

No party challenges either the Court's jurisdiction or Golden's standing in this case. Nevertheless, the Court has an independent duty to determine that it has jurisdiction over this matter and that Golden has standing to pursue its action. The Court finds that it has jurisdiction and that Golden has standing: Golden was an actual offeror, as it submitted a timely quote prior to the RFQ's deadline; and, Golden alleges facts demonstrating that, but for Census's various errors in conducting the procurement, Golden would have had a not insubstantial chance at receiving the BPA and the first call order. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *Aero Spray, Inc. v. United States*, -- Fed. Cl. --, 2021 WL 5023371, at *16 (Fed. Cl. Oct. 28, 2021).

Judgment on the administrative record, pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The Rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.* at 1354. Accordingly, this Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence contained in the administrative record. *Id.* at 1356–57.

Generally, in an action brought pursuant to § 1491(b) of the Tucker Act, the Court reviews "the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). That APA standard, in turn, requires the Court to determine "whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (citing 5 U.S.C. § 706(2)). In other words, the Court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)). "When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (internal citation marks omitted). "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

To establish prejudice on the merits in a post-award challenge, a plaintiff must further demonstrate that "but for the alleged error, there was a substantial chance that it would receive an award — that it was within the zone of active consideration." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (brackets omitted) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)); *see also Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 98 (2021) (discussing standard of review and showing of prejudice in bid protest cases).

## III.   THE COURT GRANTS THE PARTIES' RESPECTIVE MOTIONS TO SUPPLEMENT THE ADMINISTRATIVE RECORD

The Court is mindful that, ordinarily, documents or other evidence not considered by an agency in the course of a procurement decision should not be added to the administrative record that the government files with the Court in response to an action pursuant to 28 U.S.C. § 1491(b). But, as this Court has recognized, not every procurement-related dispute is so straightforward:

> But what is a plaintiff supposed to do . . . ***when the record necessarily lacks relevant documentation given the nature of the specific claims at issue***? In such circumstances, a plaintiff typically will file a motion to add documentation to the administrative record. Such motions can be categorized into two types: "[s]upplementing the administrative record in an APA case means adding material to the volume of documents the agency considered, while admitting extra-record evidence

means adding material outside of or in addition to the administrative record that was not necessarily considered by the agency." *Safari Club Int'l v. Jewell*, 111 F. Supp. 3d 1, 4 (D.D.C. 2015) (citing *Pac. Shores Subdiv. Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006)); *see SOSS2, Inc. v. United States Army Corps of Eng'rs*, 403 F. Supp. 3d 1233, 1237 (M.D. Fla. 2019) ("To supplement the administrative record means to permit review of material that the agency considered but failed to include.").

*Naval Sys., Inc. v. United States*, 153 Fed. Cl. 166, 178 (2021) (emphasis added).

In this case, the Court concludes that it makes no difference how Golden's or SFI's respective motions to add material to the administrative record are characterized. Either way, one of Golden's claims in this matter is that SFI improperly received a contract award due to SFI's misrepresentation of a proposed key personnel. *See* Am. Compl. ¶¶ 89–92; Pl. MJAR at 20–24. That claim necessitates this Court's consideration of evidence that is not contained in the administrative record and, indeed, that no one could reasonably expect to be contained in the administrative record. In that regard, to the extent any party opposed Golden's or SFI's respective motions to add material to the administrative record, no one explained during oral argument how this Court could possibly evaluate a plausible misrepresentation claim based upon only the evidence in the government's possession. *See, e.g.*, Tr. 40:15–25 (government agreeing that, in general, "you'd have to show the Court through some extra-record process that whatever the offeror asserted in the proposal is false"); Tr. 28:17–29:6 (SFI agreeing that a material misrepresentation claim ordinarily would require "extra-record evidence" but arguing that "the extra-record evidence that's being presented here doesn't state anything specific").

Given the nature of Golden's misrepresentation argument, this Court would be remiss if it did not permit the evidence in question to be added to the record. *Naval Sys., Inc.*, 153 Fed. Cl. at 182 (2021) ("These are precisely the type of circumstances in which extra-record evidence should be considered." (citing *VSolvit, LLC v. United States*, 151 Fed. Cl. 678, 686 (2020))); *see also Orion Int'l Techs. v. United States* (*Orion I*), 60 Fed. Cl. 338, 343 (2004) ("[T]he record may be supplemented with . . . relevant information that by its very nature would not be found in an agency record . . . .").

Accordingly, the Court grants the parties' respective pending motions to supplement the administrative record.[10]

---

[10] In any event, no party is prejudiced by this Court's granting the pending motions to supplement the record. As discussed below, the government and SFI prevail notwithstanding this Court's consideration of Mr. [JH]'s LinkedIn profile; SFI's materials generally are just as

## IV.   FINDINGS OF FACT[11]

### A.   The Solicitation

The Solicitation provided that Census would make an award based on "Best Value principles," meaning that Census would award the BPA (and the associated first call order) to "the responsible Quoter whose quote provides the greatest overall value to the Government, price and all other factors considered."  AR 1329.  The technical evaluation consisted of a determination of strengths, weaknesses, and risks for each quote.  AR 1330.  All technical factors were "equal in importance."  AR 1329.  Similarly, all subfactors within each technical factor were given equal weight, as well.  *Id.*  The Solicitation provided that "the Government is more concerned with obtaining superior technical capabilities than with making an award at the lowest overall price to the Government."  *Id.*  Accordingly, the Solicitation advised quoters "that the technical evaluation factors are significantly more important than price."  *Id.*

### 1.   Part 1, Technical Factor 1 — Management Approach for BPA

Under Technical Factor 1, the Solicitation instructed quoters to describe their respective plans to manage the BPA and each call order.  AR 1318.  Specifically, each quoter had to:  (1) provide details regarding how it would communicate with Census management; (2) describe the policies, procedures, and techniques the quoter would employ to ensure cost-effective and quality performance; and (3) articulate an approach to meet the requirements under the BPA's three Functional Areas.[12]  *Id.*

Each quoter was required to address several items, including its "planned process for submitting deliverables and work products to the Government," any risks associated with meeting the Functional Area requirements, and "[a]pproach[es] to support the [Agency] as needs arise."  AR 1318–19.

The Solicitation provided that the Agency would "consider strengths, weaknesses, and risks of the Quoter's approach in addressing" various requirements of the Solicitation — including, as relevant to this protest, whether each quoter's proposal

---

helpful to Golden.  In short, while the Court has considered all of the parties' additional documents, none of them alter the outcome of this case.

[11] This background section constitutes the Court's findings of fact drawn from the administrative record.  *Bannum, Inc.*, 404 F.3d at 1353–54; *see also supra* Section II.  Additional findings of fact are contained in Section V.

[12] The Solicitation specified three "Functional Areas" for which the government would issue call orders:  (1) Geography Support Services (Functional Area 0001); (2) BPA and Call Order Program and Project Management (Functional Area 0002); and (3) Geography Project Support (Functional Area 0003).  *See* AR 1217–18.

completely and accurately met the government's requested LCATs and their specified descriptions, as well as the "[c]omprehensiveness and feasibility of the Quoter's proposed Draft Master BPA: Incoming Transition Plan." AR 1330–31.

### 2.    Part 1, Technical Factor 2 — Experience and Past Performance

Technical Factor 2 consisted of two subfactors: "Similar Experience" (2A) and "Past Performance" (2B). AR 1311.

Under Subfactor 2A, Similar Experience, quoters had to provide three contract references that "have been performed, or are currently being performed, not older than July 1, 2017, and are of similar size, scope, and complexity to the work required by this RFQ." AR 1319. Quoters were permitted to supplement experience by including up to two "demonstrated experiences by any proposed subcontractors." AR 1319.

As relevant to this protest, the Solicitation provided the following definitions for scope and complexity:

> Scope: Quoter provided support simultaneously for multiple projects and/or services for national consumption and national impact.
>
> Complexity: Quoter supported organizations comprised of 5–10 large complex programs aligned to support organizational mission and supported by several semi-independent business units. Large, diverse workforce operating from multiple locations and field offices effectively using advanced information technology. Demonstration that the work was successfully coordinated with other contractors and that risks/problems were successfully addressed.

AR 1319. Quoters were permitted to include contracts on which they had performed (or on which they were performing) as either a prime contractor or subcontractor. *Id.*

### 3.    Part 1, Technical Factor 3 — Call Order 0001 — Technical

Technical Factor 3 consisted of two subfactors, including: "Technical Approach for Call Order 0001" (3A) and "Call Order 0001 Key Personnel" (3B). AR 1311. Under Subfactor 3A, quoters were to "present an approach to demonstrating the ability and the understanding of the Quoter to successfully accomplish all requirements for Call Order #0001." AR 1321. The RFQ instructed quoters to provide "an approach that provides high availability and scalability for processing of geospatial data in support of [the] MAF/TIGER system." AR 1322. Quoters also were required to provide various deliverables under Subfactor 3A. *Id.*

The Solicitation identified six key personnel for Call Order 0001, including the "Information Specialist / Knowledge Engineer" position.  AR 1370.  Under Subfactor 3B, covering key personnel, quoters had to provide "the descriptions of proposed key personnel who have been committed to perform on Call Order #0001."  AR 1322.  The Solicitation also provided that, "[a]t a minimum, this shall include the Quoter[']s Call Order Key Personnel staff required in the Call Order, and any other staff the Quoter identifies to be key personnel in accordance with the requirements."  *Id.*  For proposed key personnel, quoters had to provide résumés, in addition to various information regarding, *inter alia*, their employment status, recent work experience, technical accomplishments, and education.  AR 1323.

While the Solicitation noted that "availability and commitment of Key Personnel is important to the Government and will be evaluated through information contained in the written quote," AR 1333, the Solicitation did not require any documentation, such as letters of commitment, assuring the continued availability of key personnel.  *See* AR 1322–23.

Census "reserve[d] the right to utilize other information available to it to evaluate Key Personnel."  AR 1334.  In that regard, the Solicitation noted that "the Government may query contract references, other end-user representatives and other public sources *regarding the experience of proposed Key Personnel and the quality of their performance*."  *Id.* (emphasis added).  But that provision clearly refers to a substantive evaluation of the identified proposed key personnel.  In contrast, the Solicitation makes no reference to the government's confirming key personnel *availability or commitment* during the evaluation process.

### 4.     Part 2 — Price

Regarding Part 2, Price, the Solicitation required quoters to "submit a price quote separate from the technical quote as part of their quotation package."  AR 1323.  The price quote was to include "overall pricing for the BPA . . . includ[ing] . . .  proposed labor categories."  AR 1323.  The Price factor had two subfactors:  (1) "Master BPA Rate Card"; and (2) "Call Order 0001."  AR 1323.

To evaluate price, the RFQ required Census to review quoters' price quote templates "for completeness and accuracy," double-checking "arithmetic" and price summaries.  AR 1334.  Census also had to evaluate proposed labor rates to ensure they were "at or below the Quoter's current GSA MAS [Information Technology] contract rates" and to compare the rates to the Independent Government Cost Estimate ("IGCE").  *Id.*

B.       **Proposals and Evaluations**

In the Award Decision Memorandum, the Contracting Officer ("CO") summarized the offerors' technical and price rankings in the below chart:

| VENDOR TECHNICAL & PRICE RANKING | | | |
|---|---|---|---|
| Technical Rank (Highest to Lowest) | Vendor | Price Rank (1-Lowest to 4-Highest) | Master BPA Price |
| 1 | Spatial Front | 2nd Lowest | $77,747,904.00 |
| 2 | Golden IT | 2nd Highest | $90,142,371.64 |
| 3 | [ * * * ] | Highest | $96,459,667.20 |
| 4 | [ * * * ] | Lowest | $76,448,198.40 |

AR 2877–78.

SFI received the highest ranking for its technical quote, which was "strong, comprehensive, and well written," and "had more significant strengths and no significant weaknesses or high risks."  AR 2863–64.  The Technical Evaluation Consensus Report, AR 2596–2707, and the Award Decision Memorandum, AR 2839–81, outline in great detail the ratings each quoter received.  This opinion discusses only the ratings relevant to this protest.

1.       **Evaluation of Technical Factor 1**

Regarding SFI's "incoming transition plan," SFI received a strength for providing a "dedicated transition manager" in addition to other staff.  AR 2627.  Census noted that providing a dedicated Transition Project Management Office, "that includes a Transition Manager, is not a requirement of the RFQ" but that "having a transition team . . . coupled with SFI's previous experience . . . focused on the transition is of great value to Census."  *Id.*  In contrast, Golden proposed one person to fill both the transition manager and program manager roles.  AR 1453.38.  Golden did not receive a strength for its transition manager staffing proposal.  *See* AR 2674–81 (describing strengths and weaknesses of Golden IT's quote under Factor 1).

SFI received two separate significant strengths under Factor 1 for the "completeness and accuracy" of its proposed LCATs.  AR 2629–31.  Census awarded the first significant strength after finding that SFI "provided an additional [ * * * ] LCATs with the minimum requirement of the candidates having a bachelor's degree[]" and provided [ * * * ] LCATs with more years of experience than was required.  AR 2629.  SFI received the second significant strength for providing LCATs "that exceeded the requirements provided" for seven of the eight positions referencing certain experience with Exadata, a computing platform.  AR 2630.

Finally, SFI "did not provide the number of years of experience required for . . . 4 of the 26 LCATs," for which it received a weakness. AR 2631. As the Technical Evaluation Consensus Report notes, the proposed LCATs include a "required number of years of relevant experience," but SFI "proposed one to two years less experience with a minimum bachelor's degree" for those four LCATs. *Id.* As a result, "[t]hese LCATs did not meet the Government's minimum years of experience, making the proposed LCATs inaccurate." *Id.*

### 2.    Evaluation of Technical Factor 2

Regarding the Similar Experience Subfactor within Factor 2, which required quoters to submit three contracts that "have been performed, or are currently being performed, not older than July 1, 2017, and are of similar size, scope, and complexity to the work required by this RFQ," AR 1319, SFI received significant strengths for two of its past experiences and a strength for the third. AR 2633.

### 3.    Evaluation of Technical Factor 3

Within Subfactor 3A's criterion for providing high availability and scalability for processing of geospatial data, SFI received a strength for its "experience in providing high availability and scalability" in past contracts, which gave Census "confidence" that SFI would "build and support [a] highly available and scalable processing environment for MAF/TIGER." AR 2637. Under the same criterion, Golden received a significant weakness and high risk because its "offer was very generic in nature without any concrete quote approaches or recommendations." AR 2689.

SFI also received a significant strength within the Key Personnel subfactor for proposing Mr. [JH] as its Information Specialist / Knowledge Engineer. AR 2642. Census noted that Mr. [JH]'s technical certifications and certificates, the number of which "exceeds the requirements," would "bring knowledge and leadership to help guide Census." *Id.*

### 4.    Price Evaluation

Overall, Census determined that SFI, [ * * * ], and [ * * * ] "provided complete, accurate, and reasonable price quotes." AR 2723. Census found that "Golden IT did provide a reasonable price quote, but it did not provide a complete and accurate price quote." *Id.*

Census found that SFI "quoted the second lowest overall Master BPA price . . . at $77,747,904.00 or 16.84% below the IGCE." AR 2720. Golden "quoted the second highest overall Master BPA price . . . at $90,142,371.64 or 3.58% below the IGCE." AR 2721. Golden's Master BPA quote was thus $12,394,467.64 more expensive than that of SFI. Golden's total price for Call Order 0001 was $8,795,448.40; SFI's total price for Call Order 0001 was $7,787,284.80. AR 2718.

Census found that SFI properly understood the price quote instructions and SFI's LCATs "map[ped] correctly to their LCATs in the Technical Quotation."  AR 2713; *see also* AR 2717 ("Spatial Front's Call Order 0001 LCATs and price were consistent with the Labor Categories and Rates in their BPA price quote[.]").

Regarding Golden's price quote, in contrast, Census concluded: (1) Golden's "price quote did not provide LCATs that were consistent with the Labor Categories and Descriptions as requested" in the Solicitation; (2) Golden "failed to properly map their GSA MAS IT Labor Categories in their price quote to the BPA Roles included in their Technical Quotation"; and (3) "when Golden IT quoted the price for Call Order 0001, they deviated from the LCATs provided in their BPA Labor Category Descriptions in Tab No. 2 of their Attachment J.7 – Price Quote Template." AR 2723.[13]  Census concluded that "[t]hese inconsistencies could result in insufficient skills and lack of experience to meet all the Government's requirements as requested in Attachment J.8 LCAT Descriptions."  *Id.*; *see also* AR 2718.

### 5. Best Value Decision

The CO's best value determination included a "price [/] technical trade off analysis" between the "technically superior [SFI] quote and the lowest priced [ * * * ] quote."  AR 2878.  The CO determined that the "superior attributes of SFI's technical proposal . . . more than justifies the price premium of an additional $1,299,705.60 over the lifecycle of the BPA." AR 2880.  Accordingly, Census awarded the BPA and first call order to SFI on September 22, 2021. AR 2882–86.

### C. Employment Timeline of Key Personnel Mr. [JH]

SFI proposed Mr. [JH] to fill the Key Personnel role of Information Specialist / Knowledge Engineer.  AR 1786–90.  Mr. [JH] was an employee of SFI on May 20, 2021, the day SFI apparently submitted its quote.  ECF No. 40-1 (Declaration of [JD], SFI Vice President, Human Resources and Contracts); ECF No. 40 at 4.  Mr. [JH] departed SFI and began working for another company at some point after that — albeit by May 31, 2021, at the latest.  *See* ECF 34-1 (LinkedIn Profile of [JH]) (indicating that Mr. [JH] worked for SFI from February 2021 to May 2021 and began work at [ * * * ] in May 2021).

In any event, there is no evidence in the administrative record — or proffered by any party — suggesting that SFI had any indication prior to the time it submitted its

---

[13] Specifically, Census found that "14 of [Golden's] 26 LCATs were . . . improperly mapped." AR 2712.  Census found a similar error in Golden's proposal for Call Order 0001.  AR 2716–17 ("Golden IT's Call Order 0001 Labor Categories did not consistently match the Labor Categories in their BPA price quote Tab No. 2 — Master BPA Labor Price . . . 9 of the 17 Labor Categories . . . were inconsistent with their BPA Price Quote Labor Categories' Description[.]").

proposal that Mr. [JH] intended to leave SFI for another employer and would not be available for contract performance.

## V.   THE GOVERNMENT AND SFI ARE ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD

Golden challenges the Agency's award to SFI based upon three primary arguments:  (1) that Census engaged in disparate treatment regarding the Solicitation's evaluation factors, Pl. MJAR at 24–32; (2) that SFI violated the Solicitation's material LCAT requirements and, thus, SFI's quote is unawardable, *id.* at 18–19; and (3) that SFI's quote contained a material misrepresentation in proposing Mr. [JH] as key personnel, *id.* at 20–24.[14]  For the reasons explained below, the Court rejects each of Golden's arguments.

### A.   Census Did Not Disparately Evaluate the Quotes

Golden argues that Census "disparately treated [Golden]'s proposal during its evaluation."  Pl. MJAR at 25.  The parties agree that this Court evaluates claims of disparate treatment under the two-part standard outlined in *Office Design Group v. United States*, 951 F.3d 1366 (Fed. Cir. 2020).  Pl. MJAR at 24–25; Def. MJAR at 20.  To succeed on such a claim, a plaintiff protestor must show either:  (1) "that the agency unreasonably downgraded [the protestor's] proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals"; or (2) "that the agency inconsistently applied objective solicitation requirements between [the protestor] and other offerors, such as proposal page limits, formatting requirements, or submission deadlines."  951 F.3d at 1372.

Golden initially argued that the government's evaluation included eleven distinct instances of disparate treatment.  Pl. MJAR at 25–32.  Golden later abandoned the vast majority of those claims and, thus, the Court addresses in detail only those that were not.

For example, under Factor 1, Golden claims that Census "assigned Spatial Front a strength for proposing a dedicated transition manager as key personnel" while Golden "also proposed a transition manager as key personnel" but did not receive a strength.  Pl. MJAR at 27.  Golden contends that "the proposals are substantively indistinguishable because both [quoters] proposed a transition manager . . . as key personnel" and that "[a] reasonable evaluation would have provided Golden IT with a

---

[14] Golden asserts that, as a result of the putative misrepresentation, SFI either should have received a significant weakness with respect to the key personnel evaluation or that SFI's quote was unawardable as a matter of law.  *See* Pl. MJAR at 24.

strength to match Spatial Front." *Id.* The Court rejects this claim as plainly wrong. SFI proposed a *dedicated* transition manager — *i.e.*, one person singularly dedicated to the role — while Golden merely noted (in a parenthetical) that its product manager would "*also function*[] as [a] Transition Manager." AR 1453.38, 1453.99 (emphasis added). Golden's reply brief does not address this obvious difference; instead, Golden merely repeats its initial assertion. Pl. Reply at 15 ("[Census] assigned Spatial Front a strength for proposing a dedicated transition manager as key personnel while ignoring Golden IT's offer of the same thing."). This Court finds that the Agency reasonably concluded that SFI's dedicated transition manager is not "the same thing" as Golden's proposal to have one person perform split time between two roles. *Id.* The Court rejects Golden's disparate treatment argument regarding the Agency's evaluation of the parties' respective proposed transition managers.

Golden also contends, under Factor 2, that "Spatial Front's third past performance and experience example failed both the complexity and scope requirements because it identified no programs at all other than to say there were 'multiple . . . agencies' involved." Pl. MJAR at 29 (citing AR 1715). As explained above, the Solicitation required quoters to provide examples of three contracts that "have been performed, or are currently being performed, not older than July 1, 2017, and are of similar . . . *scope*[] *and complexity* to the work required by this RFQ." AR 1319 (emphasis added). Regarding complexity, Golden asserts that Census "erroneously" gave SFI a significant strength for its third past performance reference "because 'complexity' means supporting 5–10 large programs" and SFI only claimed to have supported four such programs. Pl. MJAR at 29.[15]

Golden is correct that past performance and experience examples must show that a quoter supported five to ten complex programs. AR 1319. The Solicitation, however, also allows quoters to "include contracts on which they have performed, *or are performing* work." *Id.* (emphasis added). Under SFI's third past performance and experience example — a contract with the United States Department of Agriculture — SFI noted that it had supported four major systems, but "was given a fifth product . . . starting February 19, 2021." AR 1715. The government clearly explains this in its response brief. Def. MJAR at 31 (describing SFI's fifth product and noting that the Solicitation allows quoters to reference contracts currently being performed). In its reply brief, Golden once again merely parrots its initial argument, but does not grapple

---

[15] Golden is incorrect that SFI received a significant strength. Rather, the Agency assigned SFI a *strength* — but not a *significant* one — for its third past performance and experience reference. AR 2633. Golden does not cite to any page in the administrative record to support the assertion that SFI received a "significant strength" for its third past performance and experience example. Pl. MJAR at 29; Pl. Reply at 16.

with the government's explanation.  Pl. Reply at 16.  This Court concludes that the government reasonably gave SFI credit for this particular past performance and experience reference and that Golden does not demonstrate otherwise.  Indeed, the government's approach makes sense given that the Solicitation allowed quoters to include contracts currently being performed.  Golden thus fails to prove that Census improperly evaluated the past performance and experience requirement.[16]

Golden further argues, under Factor 3 (Call Order 0001 — Technical), that Census erroneously assigned Golden a significant weakness and high risk rating for Golden's proposal for high availability and scalability for processing of geospatial data in support of the MAF/TIGER system.  Pl. MJAR at 30.  Golden contends that its quote "included the fact that it had been 'supporting MAF/TIGER systems for many years,' and provided a roadmap for high availability and scalability using Oracle GoldenGate, among other things," while SFI's proposal "makes no mention of 'approaches or recommendations as to how they plan to provide high availability and scalability for others.'"  *Id.* (quoting AR 2689, 1453.65).

The record undermines Golden's claims.  Census reasonably found that Golden's quote was "very generic in nature without any concrete quote approaches or recommendations as to how they plan to provide high availability and scalability for [various applications]."  AR 2689.  In addition to being vague, the section of Golden's quote covering high availability and scalability was quite brief, totaling only two paragraphs.  AR 1453.65.  In contrast, SFI's proposal contained a full four-page section dedicated to high availability and scalability for processing of geospatial data to support the MAF/TIGER system.  AR 1731–35.  Census concluded that Golden's failure to "provid[e] a detailed strategy on how to provide high availability and scalability is a High Risk[.]"  AR 2689.  The legal standard — as Golden itself articulates, Pl. MJAR at 24–25 — requires showing either that proposals are "substantively indistinguishable" or that the agency "inconsistently applied objective solicitation requirements," *Office Design Grp.*, 951 F.3d at 1372.  The proposals at issue here, however, are not "substantively indistinguishable," and Census did not "inconsistently appl[y] objective

---

[16] Past performance and experience examples also contained "scope" requirements.  *See* AR 1319.  The Court agrees with the government that Golden's MJAR is devoid of support for the conclusory assertion that SFI "failed . . . the scope requirement[]."  Pl. MJAR at 29; Def. MJAR at 31 (correctly responding that Golden's MJAR "does not offer any argument — much less record evidence — in support of its contention that SFI's [third past performance and experience example] fails the RFQ's scope requirements, and thus fails to meet its heavy burden of demonstrating that Census's decision was irrational.").  In its reply, Golden merely repeats the Solicitation's definition of the "scope" requirement but offers no support for its assertion that SFI failed the requirement.  Pl. Reply at 16.

solicitation requirements . . . such as proposal page limits, formatting requirements, or submission deadlines," in assigning Golden a significant weakness.  *Id.*

Golden raised eight other disparate treatment arguments in its MJAR.  *See* Pl. MJAR at 25–32.  The government countered each of these claims.  *See* Def. MJAR at 20–37.  Golden then failed to address these arguments in its reply brief; thus, the government contends that Golden's apparent abandonment of these claims constitutes waiver, and that the Court should not further address them.  Def. Reply at 17 n.6.[17]  The Court has carefully reviewed the briefs, agrees with the government that Golden failed to respond to the government's counterarguments and, accordingly, holds that Golden has waived those eight claims.

This Court will not permit a party to raise a phalanx of thin arguments in a dispositive motion — thereby forcing the opposing party to spend time and briefing space to engage with all of them — only to abandon them in the face of the counterarguments, and yet insist that the Court adjudicate the entire initial salvo.  Such a buckshot-like approach to advocacy undermines both judicial economy and basic notions of fairness.  *See, e.g.*, *Cap Export, LLC v. Zinus, Inc.*, 722 F. App'x 1004, 1009 (Fed.

---

[17] The government accurately identifies in its reply brief Golden's arguments that it abandoned by not responding to the government's arguments:

> The list of arguments that [Golden] has abandoned includes: (1) Census should have "credited [Golden] and [Spatial Front] with same significant strengths for their ability to provide coverage in all situations," [Pl. MJAR] at 25–26; (2) Census should have credited [Golden] and SFI with same significant strengths for their ability to ensure security, [Pl. MJAR] at 26; (3) Census should have credited [Golden] and SFI with same strengths for their proposal to "cross train" employees, [Pl. MJAR] at 26–27; (4) Census "assign[ed] Spatial Front multiple strengths for the same item," [Pl. MJAR] at 27; (5) Census erred in assigning [Golden] a weakness for not specifying "calendar or business days" in reference to its plan to update its Program Management Plan, [Pl. MJAR] at 27–28; (6) Census unfairly assigned [Golden] a weakness for "not discussing kick-off and action items deliverable requirements," [Pl. MJAR] at 28; (7) Census erred when it assigned [Golden] a significant weakness for proposing Dennis Heisler and engaged in disparate treatment by assigning SFI a significant strength for proposing Dong Zhang, [Pl. MJAR] at 30–31; and (8) Census[] "arbitrarily" failed to assign [Golden] three significant strengths for its proposed Applications Systems Analyst (Master), Database Specialist (Master), and Program Manager, [Pl. MJAR] at 31.

Def. Reply at 17 n.6.

Cir. 2018) (concluding that plaintiff-appellee "abandoned the reference altogether, as [plaintiff-appellee] did not address that reference in its opposition brief before the district court"); *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58 (2021) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver."); *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) ("We have previously held that a plaintiff has 'abandoned . . . claims by not raising them in opposition to [the defendant's] motion for summary judgment.'" (quoting *Jenkins v. City of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005))); *Allen v. Dollar Tree Stores, Inc.*, 475 F. App'x 159, 159 (9th Cir. 2012) (holding that the district court "properly dismissed" two of plaintiff's claims "because [plaintiff]'s opposition to the motion to dismiss failed to respond to [defendant]'s arguments that those claims were time-barred"); *Sportscare of Am., P.C. v. Multiplan, Inc.*, 2011 WL 589955, at *1 (D.N.J. Feb. 10, 2011) ("In most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."); *Levy-Tatum v. Navient Sols., Inc.*, 183 F. Supp. 3d 701, 712 (E.D. Pa. 2016) (finding that plaintiff, "by filing a response in opposition to [defendant]'s motion to dismiss that addressed some, but not all, of [defendant]'s arguments, abandoned those claims upon which [plaintiff] failed to make any substantive arguments, and those claims are therefore waived").

Notwithstanding that the Court holds that Golden has waived the eight arguments the government identified, the Court has considered them and rejects them on the merits for the reasons the government explained in its response brief.  *See* Def. MJAR 20–37.

In sum, Golden has failed to prove that Census engaged in disparate treatment of Golden's quote.

**B.    Census Was Not Required to Disqualify SFI Based on Its LCAT Mapping Approach**

Golden argues that the Solicitation contained various mandatory minimum requirements for LCATs, including years of experience, that quoters had to meet or be disqualified from the competition.  Pl. MJAR at 18–19.  SFI, for its part, does not dispute that it failed to "provide the number of years of experience required for the LCAT positions in 4 of the 26 LCATs." AR 2631.[18]  Golden contends, therefore, that "Spatial Front failed to meet a material term of the Solicitation" and Census "should have

---

[18] The government's technical evaluation team found that, for four positions, SFI "proposed one to two years less experience with a minimum bachelor's degree" and that "[t]hese LCATs did not meet the Government's minimum years of experience, making the proposed LCATs inaccurate."  AR 2631 (Technical Evaluation Consensus Report).

deemed Spatial Front's quote unawardable and removed it from further evaluation," rather than merely assessing a weakness. Pl. MJAR at 19. Golden's arguments fail.

As to the materiality of the government's LCAT descriptions, including years of experience, the RFQ does not mandate that quoters precisely match their available LCATs or be disqualified from the competition. Section B.3.1 ("Labor Rates") of the RFQ provides that "[t]he Government is in need of labor categories that are *comparable to* Approach LCAT Mapping." AR 1211 (emphasis added). The Court is not sure precisely what "Approach LCAT Mapping" is intended to reference — a typographical error or omission is suspected — but that provision at least suggests that the government's LCAT descriptions are not mandatory minimums. Additionally, the RFQ in Section C.5.2 ("Staffing Requirements") provides that the particular requirements of a government LCAT may be met via a combination of factors: "[t]he contractor shall maintain skilled personnel that have a *combined* knowledge and abilities that at a minimum are *consistent* in terms of specifications and categories provided in Attachment J.8, Labor Category Descriptions Table." AR 1223 (emphasis added). That provision is further evidence that any individual requirement within an LCAT description was not intended to serve as a mandatory minimum requirement for the RFQ overall.

The RFQ instructions also do not communicate that the Agency's LCAT descriptions are mandatory minimums. Section F.5.4.1.2 required a "Staffing Approach" be included with the quotes. AR 1234.[19] In particular, such documentation had to include "the Contractor's Labor Categories and Descriptions that are mapped to the Government's Labor Categories and Descriptions." AR 1236.[20] These instructions were amplified in Section L ("Instructions, Conditions, and Notice to Quoters"). For example, Section L contained a Quote Deliverables Matrix, AR 1312, in which quoters were instructed to include their "Draft BPA Staffing Approach" as Attachment 3 to the quote. AR 1313.[21] The matrix entry for the "Staffing Approach" cross-references Section F.5.4.1.2, and similarly indicates that a "Draft [is] Due with Quote," the implication being that the Solicitation recognized that the planned approach is subject to change. *Id.* More importantly, none of these instructions communicate that a quoter's various LCATs must map precisely to the government's LCATs in Attachment J.8 to avoid disqualification from the competition. *See* AR 1319 (specifying, with respect

---

[19] The "Master BPA Deliverables Chart" provides, with respect to the "Staffing Approach" deliverable, that a "**Draft** [is] due with Quote." AR 1234 (emphasis added).

[20] The government's LCAT descriptions were specified in a table, Attachment J.8 to the RFQ. AR 823–27.

[21] Elsewhere, Section L refers to Attachment 3 as the "Master BPA Staffing Plan." AR 1311.

to "Factor 1 – Management Approach for BPA," that quote deliverables must include a "Draft Staffing Approach" but not providing any further instructions beyond that "the total pages for all three attachments combined may not exceed 20 pages").

Section M provides further, almost definitive, evidence that the RFQ did not intend to elevate the government's LCAT descriptions into mandatory minimum requirements.  In that regard, Section M indicates that "the technical evaluation will be attained through a determination and analysis of strengths, weaknesses, and risks for each quote."  AR 1330 (§ M.2).  Applying that general approach to Factor 1, the RFQ provides that the government will "consider strengths, weaknesses, and risks of the Quoters['] approach in addressing" a variety of items, including "proposed labor category descriptions in the Draft Staffing Approach" — which, in turn, "will be evaluated for completeness and accuracy to meet the Government's requested LCAT[s] and descriptions."  AR 1330–31 (§ M.2.1) (citing RFQ Attachment J.8 LCAT Descriptions Table).  Reading Section M.2.1 as a whole, as the Court must,[22] the Court concludes that the RFQ required the government to assess a quoter's Draft Staffing Approach "for completeness and accuracy" and then assign strengths, weaknesses, and risks, accordingly.  That is precisely what the Agency did in this procurement.  *See* AR 2608–11 (assigning [ * * * ] a strength, a weakness, and three significant weaknesses for its Draft Staffing Approach); AR 2629–31 (assigning SFI two weaknesses and two significant strengths for its Draft Staffing Approach); AR 2655–58 (assigning [ * * * ] a strength, a weakness, and three significant weaknesses for its Draft Staffing Approach).

The Price Quote Template, *see* AR 817 (RFQ Attachment J.7), further confirms the Court's interpretation of the Solicitation's instructions regarding the LCAT mapping.  The Price Quote Template, which quoters had to complete and submit, specifically explained that "[t]he Government is in need of labor categories that are *comparable to* the BPA Roles outlined below" and that "[t]he Government[-]provided descriptions are solely based on what is anticipated for the work described in Section C of the Solicitation."  AR 817 (emphasis added).  Golden makes little to no effort to square its reading of the significance of the government's LCAT descriptions with the Price Quote Template's guidance, which, if anything, demonstrates that the government's LCAT descriptions do not contain mandatory minimum requirements.

In sum, there is essentially no indication in the RFQ that quoters were required to map their LCATs such that they precisely matched the government's LCATs in order

---

[22] *See, e.g.*, *Banknote*, 365 F.3d at 1353 (noting that courts "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions"); *see also Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021) (quoting *Banknote*, 365 F.3d at 1353).

for the quote to be awardable.  All available evidence is to the contrary.  The most the Court can conclude in support of Golden's argument is that the RFQ is ambiguous, but, of course, it is far too late for Golden to complain about that now.  *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (holding that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims").[23]

Golden's argument regarding SFI's compliance with the RFQ's putative LCAT requirements is the legal equivalent of throwing stones in a glass house, only here Golden's own house is far more fragile than SFI's.

As noted above, four of SFI's selected LCATs — in the technical part of SFI's quote — did not meet the years of experience in the corresponding government LCAT descriptions to which SFI's LCATs were mapped.  AR 2631.  The Agency appropriately assessed a weakness against SFI, as a result.  *Id.*  What Golden did was much worse:  in the technical part of its quote, Golden matched its supposedly available LCATs to those specified in the RFQ, but then, in its price quote, *substituted different* LCATs that failed to match not only the government's LCAT descriptions, but also what Golden itself had quoted in its technical volume.  AR 2782–90.  Indeed, Golden, in its price quote, failed to properly "map" 14 of its 26 LCATs — considerably more than what Golden argues should render SFI's quote unawardable.  AR 2712.[24]  To make matters worse, the required years of experience were lacking for six of Golden's 26 mapped LCATs.[25]

---

[23] Moreover, where the Agency wanted to specify a mandatory LCAT requirement, it knew how to do so.  In the Agency's responses to quoter questions, the government was asked to modify the key personnel table to distinguish between "required skills" and "preferred skills."  AR 916 (Quoter Clarifying Questions and Government Responses).  The questioner asserted that "Offerors may not present qualified personnel if they lack a specific certification or fall short of the minimum years of experience."  *Id.*  The government rejected the request, noting that "[u]nless a skill is specifically identified as preferred it will be required."  *Id.*  Thus, the Agency, with respect to key personnel, knew how to specify mandatory minimum requirements (and, even here, the government's answer creates an ambiguity because it addresses "skill[s]" but not "minimum years of experience").

[24] The Agency determined that "Golden IT did not properly map their LCATs in their BPA Price Quote to their LCATs provided in their Technical Quotation as required. 14 of the 26 LCATs were identified and deemed improperly mapped."  AR 2712 (Price Evaluation Team Report).  Golden did not contest this finding.

[25] AR 2784 (showing that Golden proposed a Business Systems Analyst with "3–5 years of relevant experience" to fill an Applications Systems Analyst (Journeyman) LCAT that required "[a] minimum of 4 years of relevant Applications System experience"); AR 2785 (showing that

Accordingly, if anything, although Golden received no weaknesses for its mapping in the technical volume, Golden's non-compliance in its price volume in all likelihood should have rendered its entire proposal unawardable.  As the Court explained above, the RFQ required the technical part of a submitted quote to contain an LCAT mapping, aligning the available categories from a quoter's GSA MAS IT contract with the Agency's LCATs described in Attachment J.8 of the RFQ.  The Solicitation then required quoters, in a separate volume — variously referred to as Part II[26] or Volume II[27] — to "submit a price quote separate from the technical quote as part of their quotation package."  AR 1323.  That price quote had to reflect "overall pricing for the BPA to include Quoters['] proposed labor categories and a description for each [GSA MAS – IT] labor category anticipated to be used under this BPA."  *Id.*  The RFQ further instructed that "Quoter[s] shall use Attachment J.7 — Titled *Price Quotation Template (Master BPA/Call Order 0001)* to complete Volume II – Price Quotation."  AR 1324 (emphasis in original).  That template, in turn, directed that "Offeror[s] shall map their proposed MAS IT Labor Categories to the BPA Roles *included in their Technical Proposal*."  AR 817 (emphasis added).

The government correctly paraphrased the RFQ pricing instructions:  "In other words, a quoter's proposed pricing labor categories must match their technical proposal[.]"  Def. MJAR at 12.  Golden failed to do so, essentially pricing a different technical approach than that which Golden proposed in its technical volume.  Such attempted gamesmanship strikes the Court as completely unacceptable in the context of the procurement itself, let alone in this litigation where Golden cannot explain why its approach was not substantively identical to, if not more problematic than, SFI's quote with regard to LCAT mapping.

---

Golden proposed a Business Systems Analyst with "3–5 years of relevant experience" to fill a Business Analyst (Journeyman) LCAT that required "[a] minimum of 4 years of relevant experience" and that Golden proposed a Business Systems Analyst with "6–9 years of relevant experience" to fill a Business Analyst (Senior) LCAT that required "[a] minimum 7 years of relevant experience"); AR 2787 (showing that Golden proposed a Software/Information Systems Specialist with "7–9 years of relevant experience" to fill a GIS Systems Analyst (Master) LCAT that required "[a] minimum of 8 years of experience"); AR 2788 (showing that Golden proposed a Subject Matter Expert with "2–7 years of relevant experience" to fill a Subject Matter Expert LCAT that required "[a] minimum of 4 years of experience"); AR 2790 (showing that Golden proposed a Software / Information Systems Specialist with "4–6 years of relevant experience" to fill a Systems Engineer LCAT that required "5 years of experience").

[26] AR 1310 (§ L.5.1.), 1311 (Table 1.0).

[27] AR 1323 (§ L.7) ("Volume II – Price Quote").

In sum, the Court rejects Golden's argument that Census should have disqualified SFI based on SFI's approach to the LCATs.  If anything, either Golden should be disqualified or, at a minimum, its reading of the RFQ precludes a finding of prejudice in its favor at least on this issue.  *VS2, LLC v. United States*, 155 Fed. Cl. 738, 768 (2021) ("The simple fact is that VS2 cannot now complain about Vectrus's and the government's interpretation of the Solicitation when VS2 relied upon the very same interpretation when preparing its proposal.").

### C.     Golden Failed to Prove That SFI's Quote Contained a Material Misrepresentation Regarding Key Personnel

Golden contends in its amended complaint that the Agency should have assigned a weakness to SFI's quote — instead of a significant strength — for proposing Mr. [JH] as key personnel for the position of Information Specialist / Knowledge Engineer.  Am. Compl. ¶ 91 ("Spatial Front's failure to disclose Mr. [JH]'s departure does not meet the [Census]'s stated important factors and Spatial Front should have received a weakness for this issue."); *see also* Pl. MJAR at 21 ("The Agency failed to consider this important aspect of Mr. [JH] as a key personnel and [SFI] should therefore have received a significant weakness.").  In Golden's MJAR, Golden argues for the first time — and without so alleging in its amended complaint — that SFI "misrepresented the availability of Mr. [JH] either when it submitted its quote or because it failed to notify the Agency of the material change to its quote when it had knowledge of Mr. [JH]'s unavailability."  Pl. MJAR at 21.  Golden thus asserts that SFI "should either have received a significant weakness for this issue or it should be ineligible for award."  *Id.* at 24 & n.7 (arguing SFI "ostensibly engaged in a 'bait and switch'").[28]  This Court assumes, without deciding, that both arguments are properly before it, notwithstanding Golden's failure to seek leave to amend its complaint a second time to assert that SFI's quote contained a material misrepresentation or that SFI engaged in an impermissible bait-and-switch.[29]  The Court rejects Golden's arguments, however, on the merits, for failing to meet its burden of proof.

---

[28] In GAO parlance, claims of material misrepresentation are "refer[red]  to . . . as a 'bait and switch.'"  *Patricio Enterprises Inc.*, B-412738, 2016 CPD ¶ 145, 2016 WL 3213000, at *3 (May 26, 2016).

[29] The Court notes that because it ordered *seriatim* (and not simultaneous) briefing, both the government and SFI had the opportunity to respond fully to all of Golden's arguments regarding Mr. [JH].  Moreover, the central facts underlying the misrepresentation argument were contained in Golden's amended complaint and had Golden sought leave to amend its complaint to add the legal claim, based on the facts already alleged, the Court in all likelihood would have permitted it.  Thus, in the Court's view, neither the government nor SFI were prejudiced by Golden's new argument in its opening MJAR.

Allegations of knowing (or reckless) material misrepresentations in a proposal are serious business. GAO, for example, described the nature of such a claim and its consequences as early as 1978 in its decision in *Informatics, Inc.*, B-188566, 57 Comp. Gen. 217, 78-1 CPD ¶ 53, 1978 WL 13361 (Jan. 20, 1978). In that case, Informatics protested NASA's having selected only a competitor, Computer Sciences Corp. ("CSC"), for final negotiations under a request for proposals for computer software services. 57 Comp. Gen. at 218. The GAO's decision focused on whether CSC's proposal misrepresented that Informatics' employees agreed to accept offers of employment from CSC should it win the contract. NASA selected CSC for final negotiations in part because it had "provided a good explanation as to how they could successfully fill [certain] positions" and because the agency had "no basis for not believing the CSC statements." *Id.* at 220. GAO ultimately determined that the "manner in which CSC actually conducted [its] survey [of Informatics' employees] [was] at complete variance with the manner represented to NASA." *Id.* at 224. Although CSC argued that its misstatement was not material, the GAO found otherwise, concluding that the "misstatement was relied upon by NASA in evaluating CSC's proposal." *Id.* at 225 ("The record shows that the procuring officer thought it was important for an offeror to be able to demonstrate that it would obtain the needed work force.").

In recommending that NASA "exclude CSC's proposal from consideration for award," GAO explained as follows:

> In the course of discussions in negotiated procurements[,] contracting agency representatives frequently ask for information from an offeror. The agency has a right to rely on the factual accuracy of the responses. Given the importance of such discussions and the delays and other difficulties which would be experienced if agency personnel were required to verify each response, we believe that the submission of a misstatement, as made in the instant procurement, which materially influences consideration of a proposal should disqualify the proposal. The integrity of the system demands no less. Any further consideration . . . would provoke suspicion and mistrust and reduce confidence in the competitive procurement system.

*Informatics,* 57 Comp. Gen. at 225.

Following *Informatics*, the GAO consistently has held that "an offeror's misrepresentation concerning personnel that materially influences an agency's

consideration of its proposal generally provides a basis for proposal rejection or reevaluation of the award decision based on the faulty proposal." *Aerospace Design & Fabrication, Inc.*, B-278896, 98-1 CPD ¶ 139, 1998 WL 253792, at *4 (May 4, 1998) (citing other GAO decisions); *Patricio Enterprises Inc.*, B-412738, 2016 CPD ¶ 145, 2016 WL 3213000, at *12 (May 26, 2016) (concluding that a "proposal contained material misrepresentations concerning the availability of its proposed personnel" and that "the appropriate remedy here is for the Corps to exclude [that] proposal from the competition").

None of those cases explain, however, the analytical basis for this Court's power to invalidate a contract award pursuant to the applicable standard of review here. *See* 28 U.S.C. § 1491(b)(4).[30]  That is, assuming for the sake of argument that SFI's proposal indeed contained a material misrepresentation, how does that render the government's procurement decision arbitrary, capricious, or otherwise contrary to law?  In other words, while knowingly (or recklessly) false assertions in a proposal may give rise to civil False Claims Act liability, *see* 31 U.S.C. § 3729(a)(1), or provide the government with grounds to terminate an awarded contract,[31] why is the government subject to a § 1491(b) action — and the possibility of an injunction — for its (arguably) reasonable reliance on an offeror's false assertions?[32]

This Court need not definitively answer these questions because the Federal Circuit has all but explicitly recognized that a plaintiff may object to a contract award on the grounds that a proposal contained a material misrepresentation.  *See Plan. Rsch.*

---

[30] "In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."  28 U.S.C. § 1491(b)(4).

[31] *See Veridyne Corp. v. United States*, 758 F.3d 1371, 1378–79 (Fed. Cir. 2014) (affirming this Court's decision finding a contractor liable pursuant to 31 U.S.C. § 3729(a)(1)(A) where the contractor's proposal contained false assertions of material fact designed to obtain a government contract); *see also id.* at 1380 ("Because Mod 0023 was obtained by fraud, each invoice submitted pursuant to that contract was tainted by that fraud.").  Even though a contractor cannot obtain any recovery for a contract awarded as the result of fraudulent conduct, *id.* at 1377–78, and even though an agency could terminate such a contract, it does not obviously follow that a third-party — a disappointed offeror — has a cause of action against the government to challenge the contract award.

[32] A possible explanation is that where an agency's contract award is based on a proposal's material misrepresentation, the award is *per se* inconsistent with a solicitation's requirements and, thus, is contrary to law.  *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1329 (Fed. Cir. 2011) ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996))).

*Corp. v. United States*, 971 F.2d 736, 740–41 (Fed. Cir. 1992) (holding "that the misrepresentations of [a contract awardee], together with the 'massive' personnel substitutions made by [the contractor] after award with the acquiescence and assistance of [the agency], tainted the bidding and evaluation process").[33]  Indeed, in *Planning Research Corp.*, the Federal Circuit quoted the GAO's *Informatics* decision at length and with approval.  *See id.* at 741 (quoting *Informatics*, 57 Comp. Gen. at 225, for the proposition that "the submission of a misstatement . . . which materially influences consideration of a proposal should disqualify the proposal").

This Court repeatedly has followed the Federal Circuit in recognizing such claims in bid protest-type actions as well.  *See, e.g.*, *Optimization Consulting, Inc. v. United States*, 115 Fed. Cl. 78, 99 (2013) ("[T]he submission of a misstatement, as made in the instant procurement, which materially influences consideration of a proposal should disqualify the proposal." (quoting *Plan. Rsch. Corp.*, 971 F.2d at 741)); *Blue & Gold Fleet, L.P. v. United States*, 70 Fed. Cl. 487, 495 (2006) ("To preserve the integrity of the solicitation process when such a material misrepresentation influences the award of the proposal, the proposal is disqualified from consideration."), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007); *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 468 (2001) (discussing *Plan. Rsch. Corp.*, 971 F.2d at 741, and explaining that "[a] bidder to a government contract who makes material misstatements in its proposal taints the award to such a bidder[,] . . . prevent[s] government officials from determining the best value to the government[,] and retard[s] the competitive bidding process[,]" such that "[w]hen a bidder is found to have misrepresented its ability to perform a contract, that bidder will lose its right to execute the solicited work"*); Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 855 (1999) (noting that the Federal Circuit in *Planning Research Corp.*, 971 F.2d at 741, cited "*Informatics* and other GAO 'bait and switch' decisions with approval"); *cf. NetCentrics Corp. v. United States*, 145 Fed. Cl. 158, 170 (2019) (citing *Plan. Rsch. Corp.* and *Informatics*, and concluding "that an agency may reasonably disqualify a proposal on material misrepresentation grounds where — despite the fact that the misrepresentation was inadvertently included in the proposal — the agency relied upon it when making its award decision").

---

[33] *Cf. Impresa*, 238 F.3d at 1339 ("It is well-established that a contracting officer should consider disqualifying a proposed contractor if a material misrepresentation is made." (citing GAO decisions)); *but see Orion I*, 60 Fed. Cl. at 345 & n.16 (noting that "the Court takes no position at this time as to whether this Court, in exercising its powers under the Administrative Dispute Resolution Act of 1996, 28 U.S.C. § 1491(b)(1)-(4), may sustain a bid protest on these grounds, *absent Army complicity*" and explaining that *Planning Research Corp.*, 971 F.2d at 739–43, involved a bait-and-switch "where [the] agency ignored evidence of the scheme and abetted it after award" (emphasis added)).

Turning to the merits, all of the parties agreed that an offeror may not knowingly misrepresent a material fact in a proposal for the purpose of winning a government contract. Accordingly, there can be no serious dispute that if SFI proposed that Mr. [JH] would serve in a key personnel role for the BPA (or the call order) — while knowing that he had planned to depart the company without any intention of serving in such a role for SFI — Golden likely would be entitled to judgment on the merits of its claim.[34] Conversely, Golden's misrepresentation claim must be rejected if SFI had a reasonable basis for proposing that it would commit Mr. [JH] to serve as a member of key personnel in performing the BPA and call order at issue. This question is fundamentally one of fact, and Golden bears the burden of proof. *See, e.g.*, *Palantir, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018) (noting that when deciding motions for judgment on the administrative record, "the court considers 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006))).

As noted above, Mr. [JH]was an employee of SFI on May 20, 2021, the day SFI apparently submitted its quote. ECF No. 40-1 (Declaration of [JD]); ECF No. 40 at 4. SFI does not dispute that Mr. [JH] departed SFI and began working for another company at some point after that, most likely by May 31, 2021, but certainly prior to the Agency's award decision. *See* ECF 34-1 (LinkedIn Profile of [JH]) (indicating Mr. [JH] worked for SFI from February 2021 to May 2021 and began working at [ * * * ] in May 2021). The fatal problem for Golden's claim, however, is that there is simply no evidence in the record — literally, nothing — demonstrating that SFI had any knowledge prior to submitting its proposal, or at any point before Mr. [JH]'s departure from SFI, that he intended to leave SFI. In the absence of any RFQ requirement that SFI secure written commitments from proposed key personnel — and particularly given that Mr. [JH] was a current SFI employee at the time of proposal submission — Golden cannot prevail on its claim, at least not on this record.

Golden contends that SFI "knew or should have known that Mr. [JH] would not be able to perform on the contract because, when proposals were due in May 2021," Mr. [JH] already left SFI or must have "delivered notice to Spatial Front indicating that he would be leaving the company to take a more senior role as a Geospatial Program Manager with [ * * * ] in Colorado." Pl. MJAR at 22. As to the first point, the Court once again finds that the administrative record, on balance, supports that Mr. [JH] was employed at SFI when it submitted its proposal; as to the latter point, Golden merely

---

[34] The key personnel requirement is unquestionably a material one. *See* AR 1333 ("The availability and commitment of Key Personnel is important to the Government and will be evaluated through information contained in the written quote.").

speculates about the timing of Mr. [JH]'s putative resignation notice.  The Court is not unsympathetic to the latter point.  If Mr. [JH] had notified SFI of his impending departure from the company in advance of its quote submission — and absent any basis for believing that he would return to work for SFI on BPA call orders as a member of SFI's key personnel — Golden likely would prevail on its claim.  The documentation SFI submitted to substantiate Mr. [JH]'s commitment to SFI certainly raises questions regarding what SFI knew about Mr. [JH]'s likely availability to serve as a key personnel and when SFI knew it (*i.e.*, prior to quote submission).[35]

Nevertheless, Golden cannot sustain its claim on questions alone.  In that regard, this may have been a case where discovery from the intervening awardee would have been warranted to supplement the administrative record.  *See Orion I*, 60 Fed. Cl. at 345 (permitting "limited discovery," in the form of interrogatories, regarding whether the successful bidder misrepresented its key personnel).  As noted above, it is almost inconceivable that the evidence necessary to support a claim of a knowing misrepresentation in a proposal would ever be located in an agency's administrative record filed with the Court.  *Id.* (permitting discovery where the necessary evidence to support a misrepresentation claim is "not something that would ever normally be found in an agency's record").  Golden, however, never sought such discovery and the Court, for obvious reasons, is loath to order such discovery *sua sponte*.[36]

Accordingly, the Court agrees with the government that as a factual matter there is "no basis in the record for the conclusion that Mr. [JH] is not 'willing to work' for SFI" — either now or at the time SFI submitted its quote.  Def. Reply at 7.

---

[35] Golden observes that SFI's supplemental documentation "does not say . . . when Spatial Front knew [JH] was leaving," arguing that "[c]ertainly, if it were true, it would be in [SFI]'s interest to tell the Court that it did not know Mr. [JH] was leaving on the date it submitted its proposal," and notes that Mr. [JH]'s letter "has not said when Spatial Front knew he was leaving employment, or that he committed at that time to return to Spatial Front's employment."  Pl. Reply at 4.  This Court agrees with the GAO — and Golden's implicit argument — "that the eventual decision of [personnel identified in a proposal] to accept employment with the awardee does not make [an offeror's] statements in its proposal untrue after the fact."  *Sev1tech, Inc.*, B-416811, 2018 CPD ¶ 429, 2018 WL 6829687, at *5 (Dec. 18, 2018).

[36] *Cf. Olaplex, Inc. v. L'Oréal USA, Inc.*, 855 F. App'x 701, 712 (Fed. Cir. 2021) (concluding that "[i]f the record contains more evidence than we have identified, [plaintiff] has not brought such additional evidence to our attention, and we need not sift the extensive record for it on our own" and quoting *Albrechtsen v. Bd. of Regents of Univ. of Wis. System*, 309 F.3d 433, 436 (7th Cir. 2002), for the proposition that "Judges are not like pigs, hunting for truffles buried in the record"); *but see Oak Grove Techs., Inc. v. United States*, 155 Fed. Cl. 84, 95 (2021) (describing a series of orders in which the Court directed the government to file the whole administrative record where the originally filed record appeared facially incomplete).

Golden further argues that SFI failed to notify Census of Mr. [JH]'s unavailability because "[t]he Solicitation requires the [CO] to consent to all key personnel substitutions."  Pl. MJAR at 23 (citing AR 1260, 1370).  Relatedly, Golden notes that the GAO "has long held that 'offerors are obligated to advise agencies of material changes in proposed staffing, even after submissions of proposals.'"  Pl. MJAR 23 n.6 (quoting *M.C. Dean, Inc.*, B-418553, 2020 CPD ¶ 206, 2020 WL 3639639, at \*3 (June 15, 2020)).

The first point is inapposite because the process specified in the RFQ for substitution of key personnel applies post-award, during contract administration, and is not a proposal instruction.  In other words, so long as SFI had a reasonable basis to propose Mr. [JH] as key personnel for the BPA work, the fact that Mr. [JH] later left the company cannot render SFI's quote unawardable.  That premise also answers Golden's second contention, asserting that SFI violated its supposed duty to update the Agency regarding changes in proposed staffing even after proposal submission.

Although the Court acknowledges the likely "obligation [of an offeror] to ascertain the continuing availability of key personnel at the time of submission *of final proposal revisions*," *OAO Corp. v. United States*, 49 Fed. Cl. 478, 482 (2001),[37] the Court is unable to locate the basis for the GAO's rule "that offerors or vendors are obligated to advise agencies of material changes in proposed staffing, even after submission of proposals." *AttainX, Inc.*, B-419306, 2021 CPD ¶ 21, 2021 WL 228876, at \*4 n.4 (Jan. 12, 2021).  Indeed, "[t]he GAO's rule that offerors are 'obligated' to notify agencies of changes in the status of their proposed key personnel" strikes the Court, candidly, as without legal basis and "unfair."  Vernon J. Edwards, *Key Personnel Substitutions After Proposal Submission: An Unfair Rule*, 31 Nash & Cibinic Rep. ¶ 59 (2017) (criticizing the rule as "GAO *diktat*" because it has not been subject to "publication in the Federal Register and an opportunity for public comment").[38]

---

[37] *See also NetCentrics Corp.*, 145 Fed. Cl. at 171 ("offerors have an 'obligation to ascertain the continuing availability of key personnel' *before submitting* [*final proposal revisions*]" (emphasis added) (citing *OAO Corp.*, 49 Fed. Cl. at 482)).

[38] "The simple facts of biology (illness, injury, incapacitation due to various causes, and death) and the common realities of business life (people retire, quit, or must be laid off or fired) make it unreasonable to expect that offerors will not experience changes in the status of their staffing over the course of such lengthy periods. The GAO requires offerors to tell agencies when there is a change, but does not require or permit agencies to provide a simple process of substitution." Vernon J. Edwards, *Key Personnel Substitutions After Proposal Submission: An Unfair Rule*, 31 Nash & Cibinic Rep. ¶ 59 (2017).  This Court concurs with that critique of the GAO's decisions.  *See* Greg Petkoff, Mark Nackman, Carla Weiss, Joshua Violanti, & Sati Harutyunyan, *FEATURE COMMENT: Disclosure Dilemma for Government Contractors Learning Before Contract Award That Proposed Key Personnel Are Not Available to Perform the Contract*, 60 No. 28 Government Contractor ¶ 228 (arguing that "GAO has no jurisdiction to make recommendations to offerors

A proposal is submitted at a point in time and is evaluated over what is often a lengthy period.  The Court agrees, of course, that an offeror must have a reasonable basis for all facts and representations made in its proposal — and may not knowingly or recklessly include false statements of material fact.  A court's assessment of an offeror's knowledge of facts and representations, however, is made with respect to the point in time at which the offeror submitted its proposal.  Software versions may change, planned approaches to contract performance might be altered or improved by the time of contract award, and employees may come and go — none of those are problems *per se*.  *Rotech Healthcare, Inc. v. United States*, 121 Fed. Cl. 387, 400 (2015) ("Even if [the awardee] ultimately did hire individuals other than those listed in its proposal, . . . that would not be evidence that [the awardee] misrepresented itself given the fact that so much time has passed since it submitted its proposal."); *Wackenhut Int'l, Inc. v. United States*, 40 Fed. Cl. 93, 99 (1998) ("If at some point after submitting its proposal [the awardee] decided to change its approach to securing the required license, such a change does not constitute fraudulent misrepresentation.").  And, where contemplated in a solicitation, the government typically has discretion to engage in discussions to verify proposal details, to extract more details and ultimately include them into an awarded contract, or to seek final proposal revisions ("FPRs") for the purpose of confirming key personnel.  But, the Court will not conjure up a rule — and particularly not one untethered from a statue, regulation, or Federal Circuit decision — requiring offerors or quoters to routinely update the government when facts and circumstances change post-proposal or quote submission, during the course of the government's evaluation period.[39]

---

— including a recommendation that an offeror disclose the unavailability of key personnel when the offeror first learns of this after proposal submission" and noting that "GAO cited no statute or regulation that is violated if an offeror does not advise an agency of a staffing or resource change that it learns about after submitting a final proposal revision"); *but see Chenega Healthcare Servs., LLC v. United States,* 138 Fed. Cl. 644, 652 (2018) (appearing to endorse the GAO's rule, noting that "[a]s the GAO stated, *when an offeror is obliged to make a change in the key personnel included in its proposal,* the agency has a choice between evaluating the original proposal as submitted, or opening discussions to allow for modified proposals" (emphasis added)).

[39] Notably, the GAO's approach to "an impending or already consummated corporate transaction" appears to primarily depend not upon an offeror's or quoter's knowledge of changed factual circumstances — and a concomitant duty to update an agency — but rather on an agency's knowledge of the transaction.  *Vertex Aerospace, LLC*, B-420073, 2021 WL 6337900, at *4 (Nov. 23, 2021).  In that recent decision, the GAO explained that its concern focuses on "where an agency is aware" of a transaction "but fails to assess the impact on proposals of the restructuring."  *Id.*  In such a case, "the agency runs the risk that its failure to do so will be deemed improper, based of course, on the unique posture of that procurement and the corporate transaction at issue."  *Id.* at *4–*5 (explaining that "[k]ey in our analysis in these

---

Accordingly, the Court declines to follow that line of GAO decisions, particularly because the undersigned agrees with Judge Wolski that "[t]he extent to which [key personnel] ha[ve] to commit to [an offeror] depends on what the solicitation required." *Orion Int'l Techs. v. United States* (*Orion II*), 66 Fed. Cl. 569, 574 (2005), *aff'd*, 185 F. App'x 966 (Fed. Cir. 2006). Here, the Solicitation did *not* require quoters to: (1) obtain commitment letters from proposed key personnel; (2) constantly verify their continued availability and willingness to serve in such roles following the BPA award; or (3) update the Agency regarding the departure of employees proposed as key personnel.

In *OAO Corp.*, this Court all but rejected the existence of a freestanding obligation to update a submitted proposal or FPR, explaining:

> It is not clear to the court that this duty exists. While much of the briefing deals with the various authorities on the elements of "bait and switch," the court must begin its legal analysis with the text of the Solicitation. The court notes that there is no language in the Solicitation which creates a duty to update the availability of key personnel between final offer and award. . . . It would have been a simple enough matter for the

---

decisions is both *whether the contracting agency was aware* of the particular corporate transaction, and of the imminence and certainty of the transaction" (emphasis added)). The Court expresses no view here as to whether the GAO's approach to pending or completed corporate transactions is correct. *See* Steven W. Feldman, *Source Selections and Corporate Restructuring: The Lessons of Wyle Laboratories*, 47 Pub. Cont. L.J. 167, 168 n.2 (2018) (noting that, at least as of late 2018, "[t]he Court of Federal Claims has yet to decide [such] a . . . protest"). The Court's point is merely to highlight a possible difference in GAO's approach to protests involving changed circumstances. *But see id.* at 192 (explaining that only "when the offeror is certain before the submission of final proposal revisions (*or even later*) that the offeror is about to undergo a definite (and not just a speculative) reorganization, the company's prompt alert to the government is not just advisable but also *required* under GAO decisional law" (emphasis added)); *Dual, Inc.*, B-280719, 98-2 CPD ¶ 133, 1998 WL 833624, at *5 (Nov. 12, 1998) ("In these circumstances, Camber had an obligation to advise the agency of the sale . . . when it agreed to the sale and lease back of facilities. . . . Because Camber did not do so, the agency's evaluation and its selection of Camber were based upon representations concerning Camber's personnel that were no longer true. The award was based on Camber's proposal representations, and to allow such an award to stand in spite of the fact that Camber had not disclosed to the agency that it would not perform the contract as proposed would call into the question the integrity of the competition."). The Court acknowledges, however, that there may be good and substantial reasons under the FAR to distinguish between, on the one hand, the type of key personnel question at issue in this case and, on the other hand, significant corporate transactions.

> agency to have added such a provision to the Solicitation in this case.

49 Fed. Cl. at 482.  Like the facts described in *OAO Corp.*, the government here is correct that the Solicitation "did not require . . . letters of commitment, but instead merely required key personnel descriptions and resumes."  Def. MJAR at 14 (citing AR 1322–23).  Nor did the RFQ require SFI to update the Agency regarding departures of key personnel proposed in the quote.  Again, this Court rejects the GAO's freestanding rule requiring offerors to update an agency regarding key personnel (*i.e.*, in the absence of a solicitation provision containing some such requirement or mandating a certification regarding the future availability or commitment of proposed personnel).

In sum, all that is necessary here is that SFI had a reasonable belief, at the time of its quote, that SFI would deploy Mr. [JH] as key personnel upon contract award.[40] There is nothing in the administrative record that demonstrates by a preponderance of the evidence that SFI lacked such a belief.  The Court thus finds the government and SFI are entitled to judgment on this issue, as well.[41]

### CONCLUSION

For the above reasons, the Court **GRANTS** the pending motions to supplement the administrative record, and further **GRANTS** the Defendant's and Defendant-Intervenor's respective motions for judgment on the administrative record.  The Court **DENIES** Plaintiff's motion for judgment on the administrative record.

Accordingly, the Clerk is directed to enter **JUDGMENT** for Defendant and Defendant-Intervenor.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge

---

[40] As Judge Wolski observed in *Orion II*, the Federal Circuit in *Planning Research Corp.* accepted the Board's finding that the offeror "never intended to hire the persons whose résumés it had submitted."  *Orion II*, 66 Fed. Cl. at 576.  No such similar evidence exists in this case.

[41] Given that the Court has determined that the government and SFI are entitled to judgment on Counts One, Two, and Three of Golden's amended complaint, the Court holds that Count Four — alleging that Census's best value analysis was arbitrary and capricious, *see* Am. Compl. ¶¶ 93–95 — similarly fails.